2000 ND 204

**Pamela MAYO, now known as Pamela Banjac, Plaintiff and Appellant,**

v.

**William M. MAYO, Defendant and Appellee.**

**No. 20000032.**

Supreme Court of North Dakota.

Dec. 7, 2000.

Rehearing Denied Jan. 30, 2001.

Mark A. Meyer of Meyer Law Firm, Wahpeton, ND, for plaintiff and appellant.

Robert J. Schultz of Conmy, Feste, Hubbard, Corwin & Brust, Ltd., Fargo, ND, for defendant and appellee. Appearance by Scott M. Knudsvig, third-year law student.

NEUMANN, Justice.

[¶ 1] Pamela Mayo, now known as Pamela Banjac, appeals from a trial court amended judgment changing custody of the parties' three minor children from her to William M. Mayo. We hold the trial court's finding that there has been a substantial change of circumstances which requires, in the best interests of the children, a change of custody, is not clearly erroneous. We affirm.

I

[¶ 2] Pamela Banjac and William Mayo divorced in 1995. Banjac was awarded primary custody of their three children. Mayo was awarded reasonable visitation, which he exercised on a regular basis after the divorce. On March 4, 1999, Mayo moved for a change of custody.

[¶ 3] Before the evidentiary hearing, the parties agreed Dr. R.P. Ascano would perform a parental capacity psychological evaluation and would serve as a neutral expert witness regarding the custody modification issue. Dr. Ascano met with Banjac, Mayo, and each of the children.

[¶ 4] In his June 10, 1999, report, Dr. Ascano noted Banjac was suffering from fibromyalgia and migraine headaches,

among other problems, and had symptoms of depression due to her chronic pain. He stated she lacked an adequate understanding of the children's developmental needs, but she was able to recognize and encourage the children's positive growth. Dr. Ascano reported the parties' oldest child and Banjac both told him Banjac had to lie down at least once a month while the oldest child would care for the two younger children. Dr. Ascano reported the oldest child said, "[S]ince their divorce, I've been watching [the youngest child], I'm kind of, technically, his second mom." Dr. Ascano conveyed a significant concern that Banjac's physical and psychological problems have resulted in the oldest child becoming destructively parentified, which refers to a child assuming adult responsibilities and acting as a care provider for younger siblings.

[¶ 5] In his report, Dr. Ascano addressed the statutory best interest factors and concluded both parents are equally bonded to the children and both parents have average parenting abilities. While the youngest child shows a greater affinity for his father, the two older children show no significant preference for either parent.

[¶ 6] Ultimately, Dr. Ascano offered the trial court alternative recommendations, depending upon whether the court granted Mayo's motion to change custody. Dr. Ascano recommended that if the court changed custody to Mayo, Mayo should undergo individual therapy to help him manage conflicts and stress and should participate in family parenting therapy. Alternatively, if the court decided physical custody should remain with Banjac, a guardian ad litem should be appointed to evaluate Banjac's ability to parent considering her chronic pain, and the children should become involved in step-family therapy followed by blended-family therapy to facilitate the adjustment of all the family members into one unit.

[¶ 7] At the June 28, 1999, evidentiary hearing, Dr. Ascano testified regarding his concern that the oldest child was beginning to show symptoms of parentification. He explained that parentification can result in children losing their childhood and having difficulty forming bonds with others in adulthood, as well as other psychological problems. He also testified the oldest child faced a substantial likelihood of significant psychological harm if Banjac remained the custodial parent. If custody were changed to Mayo, Dr. Ascano opined, the oldest child would not be subject to parentification and would not have to live with the anticipatory anxiety of caring for her siblings. Alternatively, Dr. Ascano testified that if Banjac retained custody, the parentification could be eliminated through counseling and by arranging for an available person to provide the children's care when Banjac was incapacitated. This would prevent the oldest child from taking on parenting duties when Banjac was incapacitated. However, Dr. Ascano cautioned that, unless a backup person is available at all times, any therapy designed to halt the parentification process would be completely ineffective. He testified the simplest way to alleviate the parentification problem would be to change custody because of the difficulty of ensuring a backup person would be available at all times. He concluded the custodial stability factor was outweighed by the problems the oldest child was facing. In his opinion, the change of custody determination was not a close call. Banjac had greater liability because of her health problems, and Mayo acknowledged his need to decrease the number of hours he works.

[¶ 8] On July 12, 1999, the trial court granted Mayo's motion in part and transferred physical custody of the children to Mayo on an interlocutory basis. The court allowed Banjac until July 16, 1999, to retain an adult caretaker for the children for the times she was incapacitated. The court also ordered both the caretaker and Banjac's husband, Dr. Borris Banjac, to submit to testing by Dr. Ascano. The court provided that if Banjac could demon-

strate a plan, approved by Dr. Ascano, could be implemented to eliminate the parentification of the oldest child, she would retain custody.

[¶ 9] Banjac moved the court to allow her to present new evidence from a forensic psychologist retained at her expense to give the court a second opinion on the parentification issue. The court granted Banjac's motion. The August 16, 1999, hearing was canceled and rescheduled for December 16, 1999. The court continued the interlocutory order granting Mayo physical custody.

[¶ 10] Banjac retained Dr. Thomas E. Will. In an October 27, 1999, report, Dr. Will concluded that the oldest child was not parentified. In Dr. Will's opinion, if parentification did exist, he could not say with any degree of certainty which parent caused it. According to Dr. Will, under the circumstances, the appropriate remedy is therapy not changing custody.

[¶ 11] After receiving Dr. Will's report, Mayo retained his own psychologist, Dr. Stephen A. Timm. In his November 23, 1999, report, Dr. Timm stated ten of the thirteen statutory factors used in the best interest of the child analysis favored Mayo, while none favored Banjac. Dr. Timm agreed with Dr. Ascano that parentification of the oldest child had begun. Dr. Timm concluded the weight of the evidence strongly favored granting permanent physical custody to Mayo.

[¶ 12] At the December 16, 1999, hearing, Banjac, Mayo, Dr. Timm, Dr. Will, and Dr. Ascano each testified. The trial court concluded Mayo had rebutted the best interest factor of the children's custodial stability and had shown Banjac's inability to provide the care necessary for the children was a significant change of circumstances. The trial court also found changing custody to Mayo was necessary because of the risk of significant psychological damage to the children if Banjac retained custody. The trial court issued an order granting Mayo's motion to change custody. An amended judgment was issued accordingly.

[¶ 13] Banjac appeals, arguing the trial court clearly erred in granting Mayo's motion to change custody and abused its discretion by eliciting testimony.

## II

[¶ 14] Banjac argues the trial court erred in granting Mayo's motion for change of custody.

Under N.D.C.C. § 14–09–06.6(6): The court may modify a prior custody order after the two-year period following the date of entry of an order establishing custody if the court finds:

a. On the basis of facts that have arisen since the prior order or which were unknown to the court at the time of the prior order, a material change has occurred in the circumstances of the child or the parties; and

b. The modification is necessary to serve the best interest of the child.

The party seeking modification of a custody order bears the burden of showing a change is required. N.D.C.C. § 14–09–06.6(8). A trial court's findings on a motion to modify custody will not be set aside unless they are clearly erroneous. *Anderson v. Resler,* 618 N.W.2d 480, 2000 ND 183, ¶ 8. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, there is no evidence to support it, or the reviewing court is left with a definite and firm conviction a mistake has been made. *Id.* at ¶ 8.

[¶ 15] The court found there had been a material change in circumstances since the judgment establishing custody, and modification of custody was necessary to serve the children's best interests.

## A

[¶ 16] A material change in circumstances occurs when new facts are presented that were unknown to the moving

party at the time the decree was entered. *In the Interest of N.C.C.*, 2000 ND 129, ¶ 18, 612 N.W.2d 561. Here, the trial court found:

> William has shown, by a preponderance of the evidence, that there has been a significant change in circumstances since the divorce which adversely impacts the children. Specifically, because of the health/medical problems of Pamela occurring after the divorce, Pamela has been unable to consistently provide the minimum care necessary for the children such that [the oldest child] has begun the process of becoming parentified and [the second oldest child] will also likely become parentified. This parentification of [the oldest child] is causing and will cause in the future significant and substantial impairment of [the oldest child's] emotional health and development now and in the future. The same fate will likely befall [the second oldest child]. Pamela's continued health/medical problems will remain for the rest of her life such that continuing the children in her physical care, custody and control will mean significant and substantial psychological damage to [the two oldest children].

Banjac argues the trial court clearly erred in finding the parentification of the oldest child is a material change of circumstances by erroneously relying on Dr. Ascano's opinion which was challenged by contrary evidence.

[¶ 17] All three psychologists described parentification and its deleterious effects on a child. Dr. Ascano testified parentification results in "pseudo-maturity," characterized by children acting very responsible and trying very hard to be good caretakers. The problem, Dr. Ascano testified, is parentified children minimize their own need to be nurtured because they are placed in the role of the caretaker, rather than the child. As a result, parentified children may develop significant relationship problems as adults. The parentification manifests itself in adult-hood in one of two extreme ways. The first is codependency, which results when parentified children try to compensate for the lack of nurturing they received as children. The second is continuing the self-sacrificing role of the caretaker at the expense of their own emotional needs. According to Dr. Ascano, even if parentified children are nurtured in adult relationships, they may still be emotionally deprived because they do not understand how to receive affection. Parentified children always anticipate having to give affection and help to others, neglecting their own psychological emotional needs. In his written report, Dr. Ascano stated, "[p]erhaps the greatest loss experienced by a destructively parentified child is the loss of their childhood, although the bitterness, disappointment, depression, and other effects might not be realized until later in their life."

[¶ 18] Dr. Will testified parentification is not a diagnosis in the Diagnostic and Statistical Manual of Mental Health (4th ed.1994), American Psychiatric Association (DSM–IV), but rather is a "construct that's been developed." Although he indicated significantly different definitions of parentification are possible, Dr. Will described parentification as the process in which a child loses his or her childhood after assuming the responsibilities of a parent.

[¶ 19] Dr. Timm testified parentification is "one facet of role reversal." He testified the anxiety resulting from parentification causes sleep loss, obsessive thoughts, perfectionism, over-extension, and depression. He agreed with Dr. Ascano that parentification would cause significant harm to a child's emotional health and development.

[¶ 20] In support of her argument, Banjac contends Dr. Ascano's testimony that the oldest child was showing symptoms of parentification was not credible and was challenged by contrary expert opinion. Banjac relies on Dr. Will's testimony concluding the oldest child was not suffering from parentification.

[¶ 21] Dr. Will based his opinion on the results of a parentification questionnaire he administered to the oldest child in the fall of 1999, when Mayo was her custodial parent. The test consisted of twenty "yes" or "no" questions, asked in the present tense. Because the questions were asked in the present tense, Dr. Will testified it was possible the test indicated the oldest child was not parentified at that time, when Mayo was her custodial parent. The test did not identify whether the oldest child was parentified when Banjac was her custodial parent.

[¶ 22] On the other hand, Dr. Timm testified the oldest child was suffering from an excessive sense of responsibility for her siblings as a result of parentification, causing her significant anxiety about the well-being of her siblings. Dr. Timm testified the oldest child was at high risk of suffering from the various problems resulting from parentification. Additionally, he testified the second oldest child's personality put her at even greater risk of parentification than the oldest child, and he saw symptoms of parentification beginning in the second oldest child.

[¶ 23] The trial court found Dr. Will's opinion was rebutted by the substantial evidence from Dr. Ascano and Dr. Timm showing parentification caused the oldest child significant emotional problems.

[¶ 24] The credibility of witnesses, including experts, and the weight to be given their testimony are questions of fact subject to the clearly erroneous standard of review under Rule 52(a), N.D.R.Civ.P. *In re J.K.*, 1999 ND 182, ¶ 13, 599 N.W.2d 337; *see also Bachmeier v. Wallwork Truck Centers*, 544 N.W.2d 122, 126 (N.D.1996) (stating the Court's review of expert opinion is limited and "[w]e do not re-weigh evidence on appeal.") We give great deference to the trial court's opportunity to observe and assess the credibility of the witnesses. *Hill v. Weber*, 1999 ND 74, ¶ 12, 592 N.W.2d 585. Under *Holtz v. Holtz*, 1999 ND 105, ¶ 17, 595 N.W.2d 1, endangerment of a child's physical or emotional health or impairment of a child's emotional development is a · material change in circumstances, as a matter of law, warranting a change of custody under N.D.C.C. § 14–09–06.6.

[¶ 25] Based on the evidence presented, we hold the trial court considered testimony and reports submitted by each of the three psychologists and gave each the weight it deemed appropriate. The trial court's finding the parentification of the oldest child and the possibility of the parentification of the second oldest child constitutes a material change in circumstances is not clearly erroneous.

### B

[¶ 26] In deciding whether changing custody is necessary to serve the child's best interests, the trial court must use the factors set forth in N.D.C.C. § 14–09–06.2(1). *In re N.C.C.*, 2000 ND 129, ¶ 24, 612 N.W.2d 561. "The best interests of the child must be gauged against the backdrop of the stability of the child's relationship with the custodial parent." *Id.* at ¶ 24. "A child is presumed to be better off with the custodial parent, and close calls should be resolved in favor of continuing custody." *Myers v. Myers*, 1999 ND 194, ¶ 10, 601 N.W.2d 264.

[¶ 27] Banjac argues custody should not have been changed because the decision was a close call, and therefore should have been resolved in favor of the custodial parent.

[¶ 28] In relying on an expert's opinion in determining the best interests of the children, we are sensitive to the requirement that a trial court should not abandon its ultimate responsibility to make the decision. *Severson v. Hansen*, 529 N.W.2d 167, 169 (N.D.1995).

[¶ 29] In his written report, Dr. Ascano did not make a custody recommendation. He noted that based on the information available when he prepared the

report, the custody issue was a close call. Dr. Timm, in his report, stated most of the statutory best interest factors favored placing custody with Mayo, while none favored Banjac. Dr. Timm agreed with Dr. Ascano that the oldest child had begun the process of parentification. In his report, he concluded that the weight of the evidence strongly favored granting permanent physical custody to Mayo.

[¶ 30] At the December 16, 1999, hearing, Dr. Ascano testified the custody issue was no longer a close call, after considering Dr. Timm's report, additional research on parentification, and additional information about the parties and the children. Dr. Ascano opined the oldest child faced a substantial likelihood of significant psychological harm if her custody remained with Banjac. After the second hearing, the trial court followed the recommendations of both Dr. Ascano and Dr. Timm and changed custody of the children to Mayo. The trial court gauged the best interests of the children against the backdrop of the stability of the relationship with Banjac, and we are unable to fault the trial court for deeming the danger of damage from parentification weightier than the custodial stability factor.

[¶ 31] Next, Banjac contends changing custody was not necessary to serve the best interests of the children as required by N.D.C.C. § 14–09–06.6(6)(b). Banjac relies on Dr. Will and Dr. Timm's opinions that the parentification could be resolved by a therapist, without the need to change custody. Changing custody should be the last resort, Banjac asserts, and other alternatives were available and were not used. Banjac's argument fails for two reasons.

[¶ 32] First, while we have established that custody should not be changed in alienation and frustration of visitation cases until other remedies have been attempted, *see, e.g., Hendrickson v. Hendrickson*, 1999 ND 37, ¶ 13, 590 N.W.2d 220, we have not adopted this approach in any other context. Although Banjac urges this Court to extend the approach applied in frustration of visitation cases to this case, we are not persuaded. In frustration of visitation cases, alternatives other than a change of custody must be used, at least initially, to remedy a parent's misbehavior. *Id.* at ¶ 13. This case does not involve parental misbehavior. While misbehavior can be eliminated, or at least curbed, by an offending parent, Banjac's illness and the resulting parentification of the oldest child cannot be similarly controlled. Accordingly, we deem the approach used in frustration of visitation cases inapposite, and we decline to extend its application.

[¶ 33] Second, the trial court did not clearly err in finding the change in custody was, indeed, the only remaining option. During the June 28, 1999, hearing, Dr. Ascano testified the impact of parentification could be minimized through counseling and having a backup person available, particularly if the oldest child receives the message in therapy that she is not to assume the responsibility for caring for her siblings. Dr. Ascano was asked whether the normal recommendation in a situation in which a child is experiencing parentification is to remove the child from the home. Dr. Ascano indicated removing the child would not be recommended if fibromyalgia were not involved, but fibromyalgia is incurable. According to Dr. Ascano, having a backup person available at all times would minimize the progression of the parentification. He testified it would take one or two years of therapy, assuming no failure of the backup, to eliminate the anticipatory anxiety because of Banjac's continuing physical dysfunction.

[¶ 34] Dr. Ascano distinguished the risk of parentification under Banjac's custody from a situation in which Mayo is granted custody and he is called on a work-related emergency. Dr. Ascano testified the parentification pattern was established when Banjac was suffering more frequently and severely from fibromyalgia. Although

Banjac is afflicted less often now, the oldest child's anticipatory anxiety that she might need to fill in as the caretaker has not diminished. Dr. Ascano analogized parentification to alcoholism. He stated that although the alcoholic can eliminate the drinking, the risk of a relapse exists. Analogously, Dr. Ascano testified that if the use of a backup person is implemented, if the backup person fails to be available when Banjac is incapacitated, the oldest child will again assume her role as the caretaker. As a result, the progress toward eliminating the parentification will be undone, and the oldest child's trust in adults will be destroyed. In contrast, Dr. Ascano testified the oldest child did not indicate any anticipatory anxiety or dysphoria about Mayo being called out on an emergency. Because the pattern of having to care for her siblings when her father is called out has not been established, the parentification is not present in that situation.

[¶ 35] The viability of counseling as an alternative remedy, in Dr. Ascano's opinion, depended upon coupling it with a backup caretaker available at all times. While Dr. Ascano questioned whether this option could realistically be implemented, the trial court gave Banjac the option of providing a backup person to care for the children. Banjac rejected this option. The trial court considered the significant psychological effects of parentification. The trial court considered the testimony regarding the parentification of the two oldest children. The trial court's finding that parentification was occurring and would continue if Banjac retained custody was based on an appropriate weighing of the evidence. In changing custody, the trial court found:

> There is no other remedy available, because [Banjac] rejected any exploration of any available remedy as set forth by Dr. Ascano, whereby custodial stability can be maintained with [Banjac] and the parentification process halted with a reasonable degree of certainty.

The trial court, as fact finder and arbiter of the weight to be given to the expert testimony, deemed Dr. Ascano's testimony credible and agreed with his recommendation to change custody to Mayo. The trial court gave appropriate weight to Dr. Ascano's opinion, which was supported by Dr. Timm's opinion that the weight of the evidence strongly favored granting permanent physical custody to Mayo. The trial court's finding that the change in custody was necessary is not clearly erroneous.

[¶ 36] Next, Banjac argues Mayo's motion to change custody is in reality a motion to prevent her from moving the residence of the children to Minnesota. Banjac argues Mayo knew Banjac planned to move to St. Cloud, and being unable to prevent her from moving, brought a motion for change of custody. Mayo argues he brought his motion due to a significant change in circumstances, including the deterioration of Banjac's physical and mental health.

[¶ 37] The trial court found Mayo's motion to change custody was brought in good faith and was not motivated by the potential relocation of the children. Dr. Ascano noted Mayo moved to change custody due to Banjac's limited physical ability to take care of the children. The trial court's finding is supported by the evidence and is not clearly erroneous.

[¶ 38] The trial court correctly applied the two-prong test under N.D.C.C. § 14-09-06.6(6) to determine whether custody should be changed. The trial court's finding that there has been a substantial change of circumstances which requires, in the best interests of the children, a change of custody, is not clearly erroneous.

### III

[¶ 39] Banjac argues the trial court abused its discretion by interfering with the presentation of her case by questioning witnesses during her attorney's examinations. During Dr. Timm's testimony, Banjac's attorney made an objection to

the trial court's questioning of Dr. Timm. As soon as the objection was made, the trial court ceased questioning the witness. Had the trial court persisted in its questioning following the objection Banjac might have some basis for her argument of trial court interference. Here, however, in a bench trial, the trial court ceased its questioning as soon as the objection was made. A trial court has broad discretion in its control of the presentation of evidence, and clear authority under Rule 614, N.D.R.Ev., to interrogate witnesses, particularly in a matter tried to the court. *State v. Foard*, 355 N.W.2d 822, 823 (N.D. 1984). Banjac's claim of interference is without merit.

## IV

[¶ 40] The trial court's amended judgment is affirmed.

[¶ 41] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, dissenting.

[¶ 42] I respectfully dissent. I am of the opinion that the trial court's findings of fact and conclusions of law were induced by an erroneous application of the law, and I am left with a definite and firm conviction a mistake has been made.

[¶ 43] The trial court concluded there was a substantial change in circumstances since the original custody order. After reaching that decision, the trial court concluded the change in circumstances required a change of physical custody from Banjac to Mayo in the best interests of the children. It is my opinion that although the trial court purports to weigh the stability factor against the other best interest factors, it in fact did not afford it sufficient weight in light of the available remedies. On the entire evidence, I am firmly convinced a mistake has been made.

[¶ 44] We have stated there must be a significant change of circumstances that requires the change of custody in the best interests of the child. Not every significant change, however, justifies a transfer of custody. *Ludwig v. Burchill*, 481 N.W.2d 464, 469 (N.D.1992) (Levine, J., specially concurring). "Rather, '[t]he change of circumstances must weigh against the child's best interests before a change in custody is justified.'" *Id.* at 466 (citation omitted).

[¶ 45] Here, there was no significant change in circumstances that necessitated or required a transfer of custody. The trial court primarily relied upon the opinions of Dr. Ascano. Dr. Ascano opined that Banjac's health condition has caused the oldest child to begin the process of becoming parentified. The trial court found the parentification process "is not the fault of Banjac, as it has been unwittingly caused by Banjac's health problems which have existed even before the divorce in 1995." The alleged parentification occurs when Banjac is forced to lie down for one hour each month as a result of her condition. During this hour, the oldest child is asked to look after her younger siblings, then ages ten and five. This increase in responsibility has allegedly caused the oldest child to assume a caretaking role. It is not uncommon, however, for children to assume a role as caretaker in families with one or more children for short periods of time. In his testimony, Dr. Ascano indicated birth order has a significant function in the oldest child assuming the caretaking role. The oldest child is thirteen years old, and children of a similar age are often asked to care for younger siblings when their parents leave the home for reasonable periods of time. The child's increased responsibilities are deemed contributions to the family. Watching younger siblings for one hour at a time is frequently viewed as a chore much like taking out the garbage or cleaning house. Children assuming limited caretaking roles is not a new and unique concept in our society. Historically, older children of large families assumed caretaking roles to the younger children to a large

extent. It is very natural for an older sibling to look after and feel responsibility for a younger sibling. This is common life experience.

[¶ 46] Certainly, if the oldest child were asked to care for her younger siblings for an extended period of time or on a daily basis, the case would be different. But such is not the case. The trial court found the oldest child is responsible for watching her siblings for one hour each month while Banjac retires to her bedroom. At this time, Banjac remains available to her children. Banjac stated she is never "out of commission" when she lies down and the children are free to come into her room if they need anything.

[¶ 47] It is this evidence that forms the basis for the court's conclusion the oldest child is in the process of becoming parentified because of her mother's health problems. Yet, the evidence shows the oldest child assumes the role of caretaker while in the custody of her father, Mayo. Mayo's profession as a medical doctor requires him to be on call at the hospital. When Mayo unexpectedly leaves the home for an emergency at the hospital, even at night, the oldest child is left to look after her younger siblings in much the same way as she is asked to do when her mother unexpectedly must lie down. The oldest child's role as caretaker, therefore, continues to exist while in the custody of Mayo. The trial court acknowledges there is an issue of whether the "process of parentification" has been caused by Mayo as well as Banjac.

[¶ 48] The trial court is inconsistent in its attempt to explain why it finds Dr. Ascano credible and Dr. Will not credible. Dr. Ascano's conclusions were based on a parentification questionnaire he administered to the oldest child and a thirty-minute evaluation of her. From these brief evaluations he concluded the oldest child was parentified due to Banjac's health condition. Dr. Will, however, testified such a diagnosis would require more extensive testing. He further stated that

if parentification existed, there was no accurate method available for determining who or what is responsible for it.

[¶ 49] Despite the questionable basis of Dr. Ascano's opinions regarding "parentification" of the oldest child, the trial court chooses to find the testimony of Dr. Will, Banjac's expert, not credible because the "basis for his opinions are not reliable, valid tests due to the fact they are highly subjective and lack generally recognized scientific validity and reliability as predictive tests." The testing the trial court refers to includes the Rorschach test, which has been administered and interpreted by professionals to form diagnoses in psychiatric and psychological examinations. *See State v. Iverson*, 225 N.W.2d 48, 54 (N.D.1974) (testimony of psychologist based in part on interpretations of the Rorschach test, admitted to prove defendant competent and fit to stand trial); *Bender v. North Dakota Workmen's Compensation Bureau*, 139 N.W.2d 150, 155 (N.D.1965) (psychologist's conclusions based in part upon the Rorschach test).

[¶ 50] As to the question of whether Mayo's leaving the oldest child alone to take care of the children when he had an emergency during the night contributed to the parentification process, the trial found "Dr. Ascano simply did not have enough information to make such a determination." The trial court also found "Dr. Will also concluded that it was equally likely that Mayo contributed to any propensity that [the oldest child] may have toward parentification process since he required [the oldest child] to take care of her siblings when he went to the hospital at night." Nevertheless, the trial court concluded the likelihood of continued parentification of the oldest child by Mayo was negligible based on its findings Mayo reduced his work hours. The trial court, however, in another finding acknowledges Mayo will still have emergencies to attend to. Although, the trial court ordered Mayo to reduce his work load, there is evidence that suggests he is unable to do

so. Mayo has previously made unsuccessful attempts at reducing the number of hours he works. Banjac stated, "[Mayo] said he would get better, ... and it was always going to get better, and it never did; in fact, it kept getting worse." She further stated, "[Mayo] is a remarkable doctor. He's very talented. He's got a big practice. He's very successful. And, [Mayo's] production numbers at work, the amount he generates for the clinic, mean everything to him. It validates him in a way nothing else can." Dr. Ascano, in his report found Mayo to have a pattern of "excessive devotion to his work and productivity, to the exclusion of pleasure." The record indicates Mayo has worked long hours at the hospital, which require the children to spend much of their time with care givers. Assuming the process of parentification has begun in the oldest child, this record is anything but clear as to the cause and certainly points to the conduct of both parents as contributory.

[¶ 51] Certainly if this case involved an original custody proceeding, the trial court's findings would be well within its authority. *Blotske v. Leidholm*, 487 N.W.2d 607, 611 (N.D.1992). But a modification proceeding is not equivalent to an original custody award. *Id.* at 610. In a modification proceeding, maintaining the child's stability with the custodial parent is the most compelling factor. *Lovin v. Lovin*, 1997 ND 55, ¶ 17, 561 N.W.2d 612. A presumption exits that the child is better off with the custodial parent, and close calls should be resolved in favor of continuing custody. *Myers v. Myers*, 1999 ND 194, ¶ 10, 601 N.W.2d 264. Our Court has recognized that it is not in the best interests of the child to shuffle the child back and forth between parents as the scales settle slightly toward first one parent and then the other as their circumstances change. *Starke v. Starke*, 458 N.W.2d 758, 760 (N.D.App.1990).

[¶ 52] The argument advanced for changing custody in this case does not outweigh the children's stability with Ban-

jac who has been the custodial parent since the 1995 divorce. Dr. Ascano testified the oldest child is suffering from "anticipatory anxiety" and based upon a reasonable degree of psychological certainty, she "faces a substantial likelihood of significant psychological harm" if Banjac remains her custodial parent. The trial court concluded, therefore, "these irremediable conditions" will cause substantial harm to the oldest child's emotional health. It should first be noted Dr. Ascano testified that there is a "substantial likelihood" of harm in the future. Dr. Ascano did not testify the oldest child *will* suffer harm in the future. In addition, even Dr. Ascano did not describe this case as "irremediable." In fact, Dr. Ascano suggested available remedies to stop the process of parentification so that the children could remain with Banjac. The trial court indicates there is no other remedy, other than change of custody, because Banjac rejected any exploration of any available remedy. What Banjac rejected was the conclusion her oldest daughter was "parentified." She merely asked for the opportunity to rebut that conclusion with expert testimony. That does not negate the fact that remedies exist which would halt any parentification process without a change of custody.

[¶ 53] I disagree with the majority, when it states we should not extend what we have said about alienation and frustration of visitation cases to this case. Those cases also involve potential psychological and emotional harm to children. When one parent has frustrated visitation, we have stated that the trial court should initially utilize other methods to remedy the parent's misbehavior. *Hendrickson v. Hendrickson*, 1999 ND 37, ¶ 13, 590 N.W.2d 220. We have recognized that, "after exhausting other remedies," a change in custody may be necessary to correct the damage of the defiant custodial parent. *Id.* If the use of alternative methods fails, the trial court should then consider a change in custody. *Id.* The majority, however, failed to extend the approach

used in frustration of visitation cases because it viewed such cases as "inapposite." It states: "While misbehavior can be eliminated, or at least curbed, by an offending parent, Banjac's illness and the resulting parentification of the oldest child cannot be similarly controlled." If parentification indeed exists, however, the effects of it can be eliminated through methods other than change of custody. Dr. Ascano stated that the parentification process could be eliminated either through therapy or arranging for an available person to provide for the children's care when Banjac becomes ill. He testified that the use of therapy would have the purpose of communicating to the oldest child that she is not responsible for certain duties. Alternatively, he stated the nanny option would require a person to come into the custodial home and actually assume the parental responsibilities when Banjac lies down. Dr. Ascano further stated that Banjac's husband could help eliminate the parentification problem by assuming parental duties if he is home at a time when Banjac is forced to lie down. The trial court should have initially utilized one of these options rather than uprooting the children from their established custodial home.

[¶ 54] This is a case about a 13 year old child who is the oldest child, and who is caring for her brother and sister one hour a month while her mother lies down in their home. Our Court does not operate in a vacuum. *State by and Through Heitkamp v. Quill Corp.*, 470 N.W.2d 203, 208 (N.D.1991) *rev'd on other grounds*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). "Appellate judges bring to each case their common sense, ordinary experience, and observation of human affairs."

*Id.* Here, common sense and experience dictates this child is not emotionally endangered and this is a situation that could be remedied, if necessary, by the hiring of a nanny and some therapy.

[¶ 55] I also note when Banjac and Mayo divorced in 1995, Banjac was awarded custody of the children by stipulation of the parties. In 1995, Banjac suffered from severe headaches with more frequency and was forced to retire more often. In subsequent years her situation improved with medication. Mayo was aware of Banjac's situation in 1995 and at all times subsequent to that. Nonetheless, at no time did he object to Banjac retaining custody of the children. It was not until Banjac remarried and made a decision to relocate to Minnesota with her husband that Mayo moved the court for a change of custody. Because his decision to obtain custody of the children came at a time when Banjac's condition had improved significantly, I am led to question whether his motivation was something other than concern for the children.

[¶ 56] Because I believe the trial court did not give sufficient weight to the stability factor, failed to take into consideration alternative remedies before changing custody, and erroneously changed custody of the children, I respectfully dissent.

[¶ 57] Mary Muehlen Maring